KIRKHAM *v.* MALONE.

5-2128                                    336 S. W. 2d 46

Opinion delivered June 6, 1960.

*Earl J. Lane,* for appellant.

*Jerry Witt* and *Wood, Chesnutt & Smith,* for appellee.

JIM JOHNSON, Associate Justice. Appellees, J. M. Malone and Gertrude Malone, his wife, instituted this action in the Chancery Court against appellants, William P. Kirkham and Ruby Kirkham, his wife, to set aside a deed because of failure of consideration. At the time of the conveyance, out of which this suit arises, appellant, William P. Kirkham, was married to appellees' daughter, Carrie Belle Kirkham, who is now dead.

In 1955, appellant, William P. Kirkham, and his then wife, Carrie Belle Kirkham, who will be hereinafter referred to as the Kirkhams, were living in Hot Springs, Arkansas, where Mr. Kirkham worked as a clerk in one of the gambling houses or "bookie joints", and the ap-

pellees lived in Texas. The appellees had in their custody and took care of Carrie Belle's daughter by a former marriage. On December 30, 1955, earnest money in the sum of $500 was paid to the real estate agent, Mr. Franks, on the property here in question. This $500 was paid with $300 in cash furnished by Carrie Belle Kirkham and a $200 check drawn on appellees' account in a Greenville, Texas, bank. On January 2, 1956, the transaction was closed out and a deed received wherein the balance of the consideration in the amount of $2,500 was paid in twenty-five one hundred dollar bills. The Kirkhams and appellees were all present at the time of this transaction. On March 11, 1956, a baby was born to the Kirkhams and not long thereafter it was learned that Carrie Belle Kirkham had a cancer. On August 20, 1957, the appellees executed a deed to the Kirkhams to the property wherein the consideration as recited is Ten Dollars and other good and valuable consideration. In December of 1957 Carrie Belle Kirkham died. This suit to set aside the deed made in August 1957 was filed on April 30, 1959, after appellant, William P. Kirkham, had married appellant, Ruby Kirkham, and alleges that the true consideration for the August 1957 deed was the promise of the Kirkhams that they would modernize the house, all of which the said William P. Kirkham has failed to do. The appellants filed a general denial and from a decree entered after the hearing of testimony setting aside the deed, the appellants bring this appeal based upon the theory that appellees failed to establish the alleged failure of consideration by the necessary clear, satisfactory, cogent and convincing evidence.

At the outset it must be recognized that the law is firmly established that to justify the setting aside of a deed for failure of consideration, the evidence of such failure must be clear, cogent and convincing. See: *Carnall* v. *Wilson,* 14 Ark. 482; *Rector* v. *Collins,* 46 Ark. 167; *McGuigan* v. *Gaines,* 71 Ark. 614, 77 S. W. 52; *Goerke* v. *Rodgers,* 75 Ark. 72, 86 S. W. 837; *McCracken* v. *McBee,* 96 Ark. 251, 131 S. W. 2d 450; *Adkins* v. *Hoskins,* 176 Ark. 565, 3 S. W. 2d 322; *Swim* v. *Brewster,* 177 Ark. 1171, 9 S.

W. 2d 560; *Bell* v. *Castleberry,* 96 Ark. 564, 132 S. W. 649; *Polk* v. *Brown,* 117 Ark. 321, 174 S. W. 562; *Johnson* v. *McAdoo,* 222 Ark. 914, 263 S. W. 2d 701. A careful review of the record fails to reveal any evidence that the deed in question was given in consideration of a promise by Kirkham to repair the house except the testimony of the plaintiffs, the Malones. Of course, they are interested parties and the courts are not bound to accept their testimony as true. *Stovall* v. *Stovall,* 228 Ark. 1077, 312 S. W. 2d 337; *McDaniel* v. *Johnson,* 225 Ark. 6, 278 S. W. 2d 657.

Some of the Malones' relatives did testify that they had heard Kirkham say that he intended to repair the house, and Kirkham himself says he had such intentions, but the relatives of Malone did not say that Kirkham's statement about intending to repair the house amounted to a promise or that such statement was given in consideration of a deed. As we view this entire matter on trial *de novo,* we are convinced that not only does the evidence produced by the Malones fail to make out a case by clear and convincing testimony, but it would be hard for us to say that they proved their case to any degree of satisfaction. Malone did not merely testify that he owned the property and conveyed it to the Kirkhams in consideration of an alleged promise to repair the premises, but at the very outset of his testimony Malone went into great detail as to how he acquired his alleged ownership of the property. He introduced the deed he received from Charles Dittman showing a consideration of $3,000. He went into all the details of how he had made a down payment of $300 in cash and the giving of a check for $200; that his daughter, Carrie Belle, let him have the $300 in cash to make the down payment and, further, while still testifying on direct examination, he tried to show where he got the balance of $2,500 used in making the purchase. The $2,500 was in one hundred dollar bills. He never explained where he got the one hundred dollar bills. He said he got the money from various sources — from the Government and from the sale of two farms, but he did not say such money was paid to him in one hundred dollar bills. He was asked on direct examination:

"Q. The money that you paid for that farm, except for the $300.00, was your money, is that correct?

"A. That's right."

He then stated that Carrie Belle gave him the $300. Malone was further asked on direct examination:

"Q. Mr. Malone, what was the consideration for that deed?

"A. Well, Bill Kirkham and his wife, Carrie Bell, wanted me to have——"

The sentence was not completed. He further stated that Kirkham's alleged promise to improve the property was made after the property was deeded to Kirkham and his wife, but later changed his testimony to say that the deed was made after the promise to repair. Furthermore, he testified that the repairs were to be done immediately after the deed was executed in August 1957. The suit was filed almost two years later after appellant had remarried and in the meantime it does not appear that the Malones made any demand on Kirkham to repair the house. Malone's testimony on cross-examination, in explaining where he got the $2,500, is as follows:

"Q. Where did you get the twenty-five one-hundred dollar bills?

"A. Well, I sold the farm for part of it.

"Q. When did you sell the farm?

"A. Well, it's been several years ago.

"Q. What did you get for the farm?

"A. Oh, I think I got about four or five thousand dollars for it.

"Q. In what year did you sell it?

"A. Well, I don't remember.

"Q. You ought to be able to remember that, Mr. Malone.

"A. Well, I don't though.

"Q. Was it ten years ago?

"A. No, I just don't remember that well.

"Q. Well, you remember the amount of money, but you don't remember the year you sold the farm?

"A. Well, I can remember the money.

"Q. Who did you sell it to then?

"A. I can't even think of him.

"Q. You can think of the money, but you can't think who you sold to? Are you sure you had a farm? What was the description of it, where was it located, in what County?

"A. About a mile or a mile and a half out of Whitmore.

"Q. What county is that?

"A. Well, I just can't think of the name of the county.

"Q. You can't think of the name of the County, and you can't think of the name of the person you sold it to, and you don't know the year you sold it. Now, who did you buy it from, then?

"A. I bought it from a man by the name of, he's a land dealer there, I don't believe I can recall his name.

"Q. You don't know who you bought it from?

"A. Yes, I know who I bought it from, I can't call his name, I forgot his name.

"Q. When did you buy it?

"A. Well, I thought I just told you I didn't remember the exact time when I bought it.

"Q. And you saved the money all that time, and carried it around in your pocket?

"A. I didn't say I carried it a hundred years or so, I said I had that money in my pocket, and I did, and every darn nickel of it was mine."

On the other hand, Mrs. Malone testified that they sold the land near Whitmore in 1953, and that she had been carrying the money around with her in cash since that time. Mr. Malone had testified that he was the one who carried the money in his pocket. Mrs. Malone testified that she had no confidence in banks and that is the reason she didn't have the money in the bank, but on the other hand she did give a check for $200 as a down payment on the place and the other $300 paid at that time she got from Kirkham's wife, although she testified that at the time she had $3,000 in her purse in cash.

Kirkham testified that he is a professional gambler; that he carries his money in his pocket, and when questioned on cross-examination with reference to this point he pulled out his roll and offered to let counsel for the Malones count it. He testified he let his wife have 25 one hundred dollar bills to let the Malones use in purchasing the property; that he and his wife were there at the time the property was purchased; that the deed was made to the Malones, but later at the insistence of his wife the Malones deeded the property to the Kirkhams. He testified that he wanted to help the old people all he could; that he had no intention of taking the property away from them during their lifetime, and that in the beginning he did intend to have some repairs done on the house, but that his wife became sick with a cancer and that she was in a hospital for many months at great expense and died from the disease.

Regardless of Kirkham's occupation, we cannot say that his testimony does not have the ring of truth; on the other hand, we are unable to say that the testimony of the Malones is so unreasonable as to be unworthy of belief. Consequently, herein lies the reason we must find that the Chancellor erred in setting aside the deed. The burden was on the appellees, as plaintiffs, to establish that the deed was given in consideration of appellants having the house repaired by clear, cogent and convincing evidence. See: *Murphy* v. *Osborne*, 211 Ark. 319, 200 S. W. 2d 517. This, they failed to do.

In our body of law there have grown up a number of rules and principles governing the law of real estate which have become known as "Rules of Property." While it may be argued that many of such rules are based upon technicalities, it is nevertheless true that these rules, and the technicalities upon which they are based, have come into existence and have been continued because of the ever present need for stability and predictability in this field of the law. Were this not the case then chaos soon would be the result and property values would diminish in direct relationship to the degree of instability existing in the law of this or any other state as it might be applied to real property. Consequently, economic and moral necessity have dictated the establishment of such rules and the technical basis of many of them. Thus it is that the maintaining of the integrity of such rules devolves upon this tribunal. The general welfare requires a continuation of the observance of such rules and may in special cases, as in the case at bar, be found to require a decision in accordance with these principles even though the Court may entertain great sympathy for individuals in a particular situation.

Since appellants in their prayer for relief ask that appellees be given a life estate in the property here involved, the case will be remanded for that purpose.

Reversed and remanded.

HOLT, McFADDIN, and WARD, JJ., dissent.

PAUL WARD, Associate Justice, dissenting. I am firmly convinced that the result reached by the majority is not in accord with equity or the law. As I understand that opinion it is based principally on two things: (1) that Kirkham, and not the appellees, paid the $2,500.00 in question to Charles Dittman and his wife, and (2) that the Chancellor's finding is not supported by clear and convincing testimony. My reasons for dissenting could not be adequately expressed without reviewing the case in its entirety.

*Pleadings.* On April 30, 1959 appellees filed a verified complaint which in all material parts states: On

August 20, 1957 appellees were the owners of the 40 acres of land in question; on that date they executed a Warranty Deed conveying the land to William P. Kirkham and his wife (appellants herein); said deed recites a consideration of $10.00 and other good and valuable considerations; that said deed was executed in consideration and reliance upon the promise of appellants to remodel and modernize the house located on said land for the use and benefit of appellees during their lifetime; that appellants failed and refused to carry out said agreement and the deed should be cancelled for lack of consideration. The prayer was in accordance with the above Complaint stating ''that they deny each and every allegation of the plaintiffs' complaint.''

*The Chancellor's Findings.* On the above joint issue there was a full and complete hearing before the Chancellor who made the following findings: (a) ''The plaintiffs, J. M. Malone and Gertrude Malone, paid the original purchase price of the land hereinafter described out of funds belonging to said plaintiffs with the exception of the sum of $300.00 provided by the plaintiffs' daughter''; (b) the deed from the plaintiffs to Kirkham conveying subject land was executed in consideration and reliance upon the promise of Kirkham to remodel and modernize the house on said land for the use of plaintiffs during their lifetime; (c) the defendant, Kirkham has failed and refused to carry out the said agreement and the said deed should be cancelled for the lack of consideration and the title to said lands are vested in the plaintiffs.

For a reversal appellants contend it is not shown by clear, satisfactory, and convincing testimony that, in return for the deed to them, they agreed to modernize the house for appellees to occupy as long as they lived.

The testimony is substantially as hereinafter set out. Appellee J. M. Malone who was 73 years of age at the time of the trial testified that the deed was executed to Kirkham in consideration of Kirkham's promise to modernize the house which he and his wife were to occupy for as long as they lived or either one of them lived.

"Q. What was he (Kirkham) supposed to do to make it a modern home?

"A. Well, you might say a general overhaul inside and outside, put in a pump and bath.

"Q. What else was he to do?

"A. Well, he was just to improve the house and make it a perfect modern home, that's what he said he would do.

"Q. What was the condition of the house when you moved in?

"A. Well, you could live in it, but it wasn't too good.

"Q. What did the outside walls consist of?

"A. It was boxes, stripped up.

"Q. What were the inside walls?

"A. Just had paper on it.

"Q. Was there to be any change in the outside walls?

"A. Yes.

"Q. What was he to do on that?

"A. Shingle them.

"Q. What was he to do on the interior of the house?

"A. Well, he was to put cardboard, or whatever you call it, on the inside.

"Q. You mean sheetrock?

"A. Yes, sheetrock.

"Q. He was to install a bath?

"A. Yes.

"Q. When did he agree to do that?

"A. He said he was going to do it right away.

"Q. Was that agreement made before the deed was made?

"A. No, I believe it was after we made it—no, we made it before the deed was made.

"Q. Was that agreement of William Kirkham the reason you made the deed?

"A. That's right, and no other reason.

"Q. Did Mr. Kirkham do anything to improve the property after he got the deed?

"A. He bought one small load of lumber.

"Q. Did he ever put a bath in the place?

"A. He didn't put anything in it.

"Q. Did he install the pump?

"A. Nothing.

"Q. Did he put the sheetrock in?

"A. Nothing.

"Q. Have you asked Mr. Kirkham to fix the house up?

"A. I could never even get him to talk to me.

"Q. No when was it (the deed) made?

"A. I don't remember just the exact day.

"Q. Well, was it made before or after you gave the deed to Billy (Kirkham)?

"A. It was made before we gave the deed to Billy."

Mrs. Malone in regard to the improvements to be made testified substantially as follows: Mr. Malone and I have been married fifty years and we have three living children. One of our daughters, Carrie Bell, was the wife of William Kirkham.

"Q. How did it happen that you and Mr. Malone made a deed to Mr. and Mrs. Kirkham?

"A. For them to fix our home.

"Q. Well, what was the transaction, tell us about it?

"A. He was to modernize the house, fix it in the inside, put sheetrock on the inside, and put boards on the outside, fix the bedroom, and we was to live there as long as we live, and then it went back to him and Carrie Bell.

"Q. Would you have signed that deed if you had known he was not going to fix the house up?

"A. No, I had confidence in him, I loved him like I loved a son.

"Q. Did he ever fix the house?

"A. Never, since my daughter died.

"Q. Did he ever do anything on it except put the load of lumber there?

"A. No, it's out there in the barn now.

"Q. Have you had a telephone conversation with him since your daughter died?

"A. Yes, he called me down at Chester Wright's one day, and Chester Wright got into his car and come over there and I went; Billy called me and said, 'Grandma, that's your place, and any damn thing you want to do with it,' over the telephone. Chester Wright was standing there and heard every word of it. He said 'its yours, so later do anything you want to'. That was a long distance call.

"Q. Who paid the insurance on the place the whole time you had it?

"A. I have and Mr. Malone.

"Q. Did Billy (Kirkham) ever pay the insurance?

"A. No, I paid it this year and last."

Mrs. Hignight, a sister to Mr. Malone, testified that she and her husband, Mr. and Mrs. Benrus, her sister and her daughter were all at the home of Mr. and Mrs. Malone in 1957 at the time Mr. Kirkham stated before all of them that he was going to fix up the home and modernize it.

"Q. What did he say he was going to do?

"A. He said he was going to put the sheetrock in, just said he was going to modernize the home for them.

"Q. Was the home ever modernized?

"A. No, it wasn't."

Mrs. Carrie McGee and Mrs. Carl H. Vineyard were present at the meeting above referred to at the home of Mr. and Mrs. Malone and they testified substantially the same as Mrs. Hignight.

In the face of the above testimony appellants offer practically nothing to the contrary. Mr. Kirkham even admits that he did promise that he would make some repairs and he further admits that he did nothing. In spite of all of this the majority would overturn the direct and positive finding of the Chancellor (set out above) who had the opportunity (which we do not have) to observe the witnesses on the stand.

The conclusion reached by the majority appears to be based largely if not primarily on the ground that the $2,500.00 payment was made by Mr. Kirkham and not by appellees. My remarks hereafter are addressed to that point.

First, under the pleadings in this case the payment of the said $2,500.00 is not an issue vital to the decision. The important thing is (and this is undisputed) that the title to subject property was in appellees and not in appellants, and that appellees then deeded it to appellants. The payment of the $2,500.00 to my mind could have no bearing in the case except possibly to go to the credibility of the witnesses. Viewed in that light a reference to the testimony in this case is indeed revealing.

It is obvious that the majority do not believe appellees were in possession of the $2,500.00 which they admittedly paid to Dittman. This means, therefore, that the majority believe Kirkham's version. I can only point out from the record that Mr. Malone who appears to be a substantial citizen of the age of 73 years testified that they had saved that amount of money and explained where he got it; that

his wife, Mrs. Malone, testified to the same thing; and that the real estate man testified that he received the money from them. Over and against this testimony stands only the uncorroborated statement of Kirkham who is a confessed lifetime gambler, and who made no effort to explain where he got the money or the reason why he carried it around on his person. On the other hand appellees explained that they had lost all of their money along about 1930 because of the bank failure. I submit in all seriousness that the above statement of facts confirms rather than refutes the credibility of appellees.

There is of course no definite workable rule by which to tell when testimony is clear and convincing—especially one that fits all people. Therefore we should, I believe, be guided by what was satisfactory to the Chancellor, especially where any doubt exists. This thought was impliedly expressed in the recent opinion of *Odom* v. *Odom*, 232 Ark. 229, 335 S. W. 2d 301, where we said: "This question is not free from doubt, but after studying the record we are unable to say that the chancellor was in error in finding the plaintiff's proof to be sufficiently clear and convincing."